Affirmed by published opinion. Judge MOTZ wrote the majority opinion, in which Judge KING joined. Judge GREGORY wrote a dissenting opinion.
DIANA GRIBBON MOTZ, Circuit Judge:
A jury found Lavelle Stover guilty of possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) (2012). On appeal, Stover challenges the district court’s denial of his motion to suppress the firearm as the fruit of an illegal seizure. For the reasons that follow, we affirm.
I.
In the early morning hours of March 13, • 2013, uniformed Prince George’s County Police Officers Justice Halsey and Jesus Yambot patrolled the “King Sector” of Temple Hills, Maryland, an area where several violent robberies had recently occurred. Around 1:00 a.m., the officers noticed a Chevy Silverado double-parked in the small private parking lot of an apart-ment building. The officers could see a man in the driver’s seat and a woman in the front passenger seat.
Although Officer Halsey conceded that it was “not suspicious for someone to be sitting in a parking lot,” the officers nonetheless decided to return a few minutes later to check on the car. When they did, they again saw the Silverado parked and occupied as before. According to Officer Halsey, the ear’s Virginia license plates indicated that “the car d[idn]’t belong.” Because of the out-of-state plates, the area’s, “high-crime” reputation, the late hour, and the double-parking, the officers concluded that they had “the right to stop the occupant of the car and see what’s going on.” Officer Yambot pulled the marked police vehicle into the lot and parked at a 45-degree angle about three feet behind the Silverado, blocking it in. The officers activated their vehicle’s emergency lights “to notify [the driver] that [they were] behind him because [they didn’t] want to get ran [sic] over.” Then Officer Yambot illuminated the driver’s side' of the Silverado with a spotlight.
As the district court observed, the suppression hearing testimony was “far from crystal clear” as to the exact sequence and timing of the ensuing encounter. Officer Halsey testified as follows. After Officer Yambot parked the police vehicle, Stover, the individual sitting in the driver’s seat of the Silverado, opened his door, emerged from the car, and opened the driver’s side backseat door to the Silverado. Officer Halsey left the police car and gave Stover “a verbal command to get back inside of the vehicle.” Officer Halsey could not see exactly what Stover was doing or if Stover had anything in his hands because Stover was “standing in between both doors” of the Silverado. Stover made no response to Officer Halsey; indeed, he never “acknowledged” the officer. Instead, Stover quickly walked about five or six feet to the Silverado’s front hood. To Officer Halsey, this movement away from the police car looked like “flight.” Officer Halsey then ran along the passenger side of the Silver-ado to its hood, where he saw Stover “toss a gun in front of the vehicle.” At that point, Officer Halsey pointed his own gun at Stover and ordered him to get back inside the Silverado, which Stover did without a word. The officers retrieved a loaded nine-millimeter Glock from the grass in front of the hood of the Silverado.
Stover did not testify at the suppression hearing. His passenger testified that after the police officers parked and exited their *994 vehicle, Stover very briefly got out of his car but was immediately met by Officer Yambot, who “made both [Stover and his passenger] lay on the ground” before arresting them. The entire incident happened in a very short period of time. According to Officer Halsey, between two and five minutes; according to the passenger, five seconds.
Upon consideration of these conflicting accounts, the district court found the following facts by a preponderance of the evidence. After the police vehicle pulled up, Stover “did, at some point, get out of the car and did open [two] car door[s],” and “did, at some point, beg[i]n to walk to the front of the car.” “At some point,” Officer Halsey “said, get back in the car and tried to stop the defendant from getting out of the car.” When Officer Halsey saw Stover move to the front of the Silver-ado, the officer “ran to the front of the car with his gun out, and put the gun in the face of the defendant, meeting him in the front of the car.” “[I]t was the presence of [Officer Halsey’s] gun in the face of the defendant that caused him to acquiesce” and “[t]hat was after [Stover] had dropped the gun.” Only after Stover dropped his loaded gun did he comply with police orders and get back in the Silverado.
A federal grand jury indicted Stover on a single count of possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) (2012). Stover moved to suppress the gun as the fruit of an illegal seizure. In response, the Government did not maintain that the officers had reasonable suspicion to stop Stover. Instead, the Government argued that, under California v. Hodari D., 499 U.S. 621; 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), Stover did not submit to the police — and thus was not seized — ■ until after he dropped his loaded gun, and so abandoned it, at the hood of his car. The district court agreed, finding that Sto-ver did not acquiesce to the “show of authority that had attempted to put him in a seizure” until Officer Halsey met him at the front of the Silverado, gun drawn, and “actually exercised [ ] control over the defendant.” Because Stover tossed his gun prior to complying.with the police orders, the district court found the gun had been abandoned before the seizure and so was admissible at trial.
A jury found Stover guilty and the district court sentenced him to 57 months in prison. Stover timely filed this appeal challenging the district court’s denial of his suppression motion. When considering a district court’s denial of a motion to suppress, we review the court’s factual findings for clear error and all legal conclusions de novo. United States v. Weaver, 282 F.3d 302, 309 (4th Cir.2002). “When, as here, a motion to suppress has been denied, we view the evidence presented in the light most favorable to the government.” United States v. Watson, 703 F.3d 684, 689 (4th Cir.2013).
II.
The parties do not dispute that Stover was at some point seized during his interaction with the officers in the parking lot. They do dispute when this seizure occurred. On appeal, Stover no longer contends that he did not get out of his Silvera-do, walk to the front of the vehicle, and drop his gun there.[1] Rather, he argues *995 that the officers seized him, without reasonable suspicion, at the moment the police vehicle pulled up behind his Silverado, rendering his gun the fruit of an illegal seizure. The Government maintains that the officers did not seize Stover until after he abandoned his firearm in front of his car, prior to submitting to police authority.
The Fourth Amendment protects “[t]he right of the people to be secure in their persons ... against unreasonable ... seizures.” U.S. Const, amend. TV. This guarantee, however, “does not extend to all police-citizen encounters.” United States v. Jones, 678 F.3d 293, 298-99 (4th Cir.2012). As a general matter, law enforcement officers do not seize individuals “merely by approaching [them] on the street or in other public places and putting questions to them.” United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Rather, as the Supreme Court has explained, “[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a ‘seizure’ has occurred.” Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Where, as here, physical force is absent, a seizure requires both a “show of authority” from law enforcement officers and “submission to the assertion of authority” by the defendant. California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)(emphasis omitted).
To determine whether police have displayed a show of authority sufficient to implicate the Fourth Amendment, a court applies the objective test set forth in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion). The police have done so “only if, in' view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.” Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870; United States v. Gray, 883 F.2d 320, 322 (4th Cir.1989). A court considers a number of factors in resolving whether an officer’s conduct would convey to a reasonable person that he is not free to leave. See, e.g., Michigan v. Chesternut, 486 U.S. 567, 575-6, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (listing examples of police behavior that “communieate[ ] to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement,” including “activating] a siren or flashers,” “commanding a person] to halt,” or “operating] the [police] car in an aggressive manner to block [a person]’s course”); Jones, 678 F.3d at 299-300 (listing various relevant factors). Only if a reasonable person would feel free to terminate the encounter does a court consider the interaction a consensual one to which the Fourth Amendment protection against unreasonable seizures does not apply. See Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).
 If an interaction is not consensual, i.e., if a reasonable person would not have felt free to terminate it, then the Fourth Amendment guards against unreasonable seizures. In such cases, however, the seizure inquiry does not end. The Mendenhall test “states a necessary, but not a sufficient, condition for ... seizure effected through a ‘show of authority.’ ” Hodari D., 499 U.S. at 628, 111 S.Ct. 1547 (emphasis in original). When submission to police authority is disputed, a court must also ascertain whether and when the subject of the seizure actually acquiesced to that authority. Hodari D., 499 U.S. at 628-29, 111 S.Ct. 1547; Brendlin, 551 U.S. at 254, 127 S.Ct. 2400.
“[W]hen an individual’s submission to a show of governmental authority takes the form of passive acquiescence,” the relevant test “for telling when a seizure occurs in response to authority” is *996 that enunciated in Mendenhall. Brendlin, 551 U.S. at 255, 127 S.Ct. 2400. But, in cases where the individual does not clearly and immediately submit to police authority, courts must determine when and how the submission occurred. See, e.g., United States v. Lender, 985 F.2d 151, 153-55 (4th Cir.1993). “[W]ithout actual submission” to the police, “there is at most an attempted seizure,” which is not subject to Fourth Amendment protection. Brendlin, 551 U.S. at 254, 127 S.Ct. 2400; see also Hodari D., 499 U.S. at 626-27 & n. 2, 111 S.Ct. 1547.
Brendlin does not create a new analysis for determining when and if submission to police authority has occurred. Rather, Brendlin simply applies the analysis set forth in Hodari D. Brendlin, 551 U.S. at 254, 257-58, 261-62, 127 S.Ct. 2400. See also Wayne R. LaFave, 4 Search & Seizure § 9.4(d) (5th ed.2015) (describing how Brendlin uneventfully applies Hodari D.). Thus, Hodari D. established the broad principle that an individual must submit to authority for a seizure to occur; Brendlin teaches that “passive acquiescence” is one form of that submission.[2]
As with the “show of authority” analysis, determining what constitutes “submission” can be a difficult, fact-intensive inquiry. “[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.” Brendlin, 551 U.S. at 262, 127 S.Ct. 2400; see also LaFave, 4 Search & Seizure § 9.4(d) (observing that “lower courts will frequently be confronted with difficult questions concerning precisely when the requisite physical seizure or submission to authority ... occurs”). If an individual does submit to a show of police authority, and police then discover evidence, the court must assess whether either reasonable suspicion or probable cause supported the seizure. See Terry, 392 U.S. at 20-21, 88 S.Ct. 1868.
III.
With these principles in mind, we first consider whether, under the totality of the circumstances in the instant case, a reasonable person would have felt free to leave after the officers pulled up behind Stover’s car. See Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870. This is necessary because, although in the district court the Government did not contend that the encounter was consensual, on appeal it argues that “a reasonable person would have felt free to leave” when the police arrived. Appellee’s Br. at 18. We disagree. Indeed, this is not a close question here, for this is not a case involving a police officer’s “polite request for an interview.” Gray, 883 F.2d at 322; see also United States v. Brown, 401 F.3d 588, 593 (4th Cir.2005). Rather, as the district court noted, the police officers’ aggressive'conduct from the start of their interaction with Stover was *997 “absolutely an effort [ ] to try to effect ... a seizure.”
In Jones, we recently considered whether similar officer conduct would have left a reasonable person believing he was free to leave. There, officers followed defendant Jones’ car into an apartment driveway and parked so that the car could not exit. 678 F.3d at 296-97. When Jones emerged from his car and stood by the car door, the police officers “proceeded immediately to speak to Jones” and pat him down for weapons. Id. at 297-98. We reasoned that “when an officer blocks a defendant’s car from leaving the scene ... the officer demonstrates a greater show of authority than does an officer who just happens to be on the scene and engages a citizen in conversation.” Id. at 302. In combination with this fact, the officers were armed and in uniform; they proceeded immediately to the driver’s side door; and they did not ask if they could speak with Jones. Id. at 300, 303. Instead, they requested that he lift his shirt and allow an officer to pat him ■down. Id. Under the totality of the circumstances, we held that a reasonable person would not have felt “free to leave or terminate the encounter.” Id. at 304.
Jones squarely compels the conclusion that Stover too was not free to leave. Although here the officers did not follow Stover’s car into the parking lot, the rest of the Jones factors are present: the officers, who blocked Stover’s vehicle, were armed and uniformed and approached Stover immediately, without asking if they could speak with him. Indeed, in this case, the officers activated their vehicle’s emergency lights, trained a spotlight on Stover, and drew their weapons, making this an even clearer case of a police show of authority than Jones.[3] See, e.g., Chesternut, 486 U.S. at 575-76, 108 S.Ct. 1975 (including police use of “flashers” and “display[] [of] weapons” as indications of a show of authority). No reasonable person in Stover’s position would have felt free to terminate the encounter.
IV.
Having concluded that the district court committed no error in finding that the officers demonstrated a show of authority sufficient to implicate the Fourth Amendment, we turn to the question of whether the court erred in finding that Stover did not submit to police authority prior to abandoning his gun.
Up and until Stover submitted, “there [was] at most an attempted seizure, so far as the Fourth Amendment is concerned,” and the Supreme Court has held that the Fourth Amendment does not protect attempted seizures. Brendlin, 551 U.S. at 254, 127 S.Ct. 2400; see also Cty. of Sacra *998 mento v. Lewis, 523 U.S. 833, 845 n. 7, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (“Attempted seizures of a person are beyond the scope of the Fourth Amendment.”). For example, in the seminal Supreme Court decision on submission, Hodari D., the defendant ran from approaching police officers, tossing away a rock of crack cocaine just before an officer tackled him. 499 U.S. at 623, 111 S.Ct. 1547. The Court held that, because the defendant had not submitted to police prior to being tackled, he was not seized when he tossed the contraband. Id. at 629, 111 S.Ct. 1547. In contrast, the Supreme Court more recently described a car passenger who remained inside the car during a traffic, stop as submitting to 'police authority through “passive acquiescence,” and so held the contraband subsequently found in the passenger’s possession should have been suppressed. Brendlin, 551 U.S. at 255, 262-63, 127 S.Ct. 2400.
To be sure, a range of conduct exists between the “passive acquiescence” in Brendlin and the headlong flight in Ho-dari D. A defendant does not have to remain frozen in order to submit. Nor does he need to bolt from the scene to signal non-submission. Stover argues that he passively acquiesced to police authority by “remaining at the scene.” The district court, however, found that a preponderance of the evidence established that Sto-ver did not acquiesce to the police officer’s show of authority until after he discarded his loaded gun.
We must view the district court’s finding in the best light for the Government, because it prevailed below. Viewed in that light, the evidence shows that instead of remaining seated in his car when the police vehicle approached, Stover exited his car with a loaded gun in his hand. The district court found that Officer Halsey “tried to keep [Stover] from getting out of the car.” But Stover walked away from the officers to the hood of his car, despite their orders to “get back in the car.” Only after Stover dropped his firearm did he comply with the police orders. For only then, upon seeing Officer Halsey in front of him with a police weapon drawn,[4] did Stover get back in his car evidence, the district court did not clearly err in finding that Stover had not submitted until after he had discarded his loaded gun.
On appeal, Stover relies heavily on three cases in which we reversed the district court’s denial of a suppression motion. Jones, 678 F.3d 293; United States v. Black, 707 F.3d 531 (4th Cir.2013); and United States v. Wilson, 953 F.2d 116 (4th Cir.1991). Like the case at hand, these cases involve interactions initiated by police without reasonable suspicion. But, unlike the case at hand, in each of these cases the defendant did submit to police authority before the discovery of any contraband. Moreover, none of these cases involve the issue at the crux of this case— *999 an individual’s ambiguous reaction at the outset of a police show of authority.
In Jones, the defendant’s submission was undisputed. The Government did not even suggest that the gun it ultimately found on Jones should be admitted because Jones had not submitted to police authority. Rather, Jones’ passive acquiescence and submission to police authority were so clear that the Government’s only argument was that Jones’ submission evidenced a “consensual” encounter, in which Jones “consented” to the search. Brief of the United States at 10-29, Jones, 678 F.3d 293 (No. 11-4268). Thus, whether in fact the encounter was consensual was the only contested issue in Jones.[5] Jones argued that he was not free to go; the Government maintained that he was. As explained above, we agreed with Jones and so held that the weapon the police found on him should have been suppressed. Jones, 678 F.3d at 305.
Nor do Black or Wilson assist Stover. In both, the defendants, unlike Stover, submitted to police authority. After police officers surrounded Black, he responded by being “extremely cooperative,” even volunteering his ID, which an officer pinned to his uniform. Black, 707 F.3d at 536-38. When, after this cooperation, Black attempted to walk away from the suspicionless stop, police tackled him and then uncovered his gun. Id. at 536. Because Black had submitted to police authority by his “passive acquiescence” prior to the discovery of his weapon, we held that the weapon should have been suppressed. Id. at 537 n. 3, 542.[6] Similarly,
in Wilson, when police identified themselves and asked to question Wilson in an airport terminal, Wilson provided them with information as to his flight, his identification, and his educational plans, and submitted to a patdown search. 953 F.2d at 118. The officers insisted on asking more questions, attempting to prolong the encounter. Id. Wilson refused and walked away. Id. When the officers nonetheless persisted, ultimately finding illegal drugs in Wilson’s coat, we held that the drugs should have been suppressed. Id. at 119— 20,127.
Stover maintains that his walk to the front of his Silverado is akin to the defendants’ movements in Black and Wilson. The problem for Stover is that, unlike the defendants in Black and Wilson, he did not submit to police authority at any point before he began that walk. Stover’s initial action was not to cooperate with police and answer their questions, as in Black and Wilson. Rather, as soon as the police blocked his Silverado, he left the car, disobeyed a police order to return to the car, and instead walked away from the police with a loaded gun in his hand. Only after he discarded that gun and was confronted by an armed police officer did Stover submit to police authority.
Jones, Black, and Wilson simply do not involve the critical inquiry here: where to draw the line between submission and non-submission in the face of an individual’s equivocal reaction to police acts initiating a show of authority. In cases dealing with this issue, we have found dispositive the same indicia of noncompliance present *1000 here. For example, in Lender, we found non-submission where the defendant walked away from approaching officers, ignoring their orders, “fumbling with something” at his waist, and halting just before his gun fell out of his pants. 985 F.2d at 153-55. There, as here, the defendant asked “us to characterize as capitulation conduct that is fully consistent with preparation to whirl and shoot the officers.” Id. at 155. Similarly, in United States v. Smith, 396 F.3d 579, 581-82 (4th Cir.2005), we rejected the defendant’s argument that he was seized when police activated their emergency lights and blocked his car’s exit, because although his car had been stationary, he “proceeded slowly” away when police approached. We concluded that the defendant “was not seized until he finally submitted to [the officerj’s show of authority by stopping at the end of the driveway.” Id. at 586 n. 5.
Other courts have reached similar conclusions. See United States v. Salazar, 609 F.3d 1059, 1066-68 (10th Cir.2010) (holding driver not seized when he backed away slowly from police vehicle before obeying trooper’s command to get out of his truck); United States v. Jones, 562 F.3d 768, 772-75 (6th Cir.2009) (holding that, although seizure of seated passengers occurred when police cars “block[ed]. in” defendant’s car, defendant himself was not seized because he immediately “ ‘jumped out’ as though he wanted to run”); United States v. Johnson, 212 F.3d 1313, 1316-17 (D.C.Cir.2000) (holding that defendant sitting in parked car did not submit to police when he made “continued furtive gestures” including “shoving down” motions “suggestive of hiding (or retrieving) a gun”). Although we do not necessarily adopt the lower standards of submission recognized in some of these cases, they do demonstrate that Stover’s contentions would not fare better in other circuits. Indeed, Sto-ver has not cited, and we have not found, a single case where an individual who exits his car holding a loaded gun, ignores police orders, and walks away from police officers was found to have submitted to police authority.[7]
Our holding might well be different if Stover had, for example, remained in his car or dropped his gun and complied with police orders immediately upon exiting his car. See, e.g., Brendlin, 551 U.S. at 262, 127 S.Ct. 2400 (holding that passenger in car pulled over during traffic stop submitted “by staying inside” the car); Brown, 401 F.3d at 594 (finding submission when defendant complied with police request to place his hands on a car); United States v. Wood, 981 F.2d 536, 540 (D.C.Cir.1992) (finding submission when, upon officer’s order to stop, defendant stopped and “immediately dropped the weapon between his feet”). These are just a few of the ways an individual might be able to signal compliance. But, under the totality of the facts as found by the district court in this case, we cannot hold that walking away from police with a loaded gun in hand, in contravention of police orders, constitutes submission to police authority. Since Sto-ver did not accede to police authority until *1001 confronted by an armed officer in front of the Silverado, the gun he discarded prior' to that time was not the fruit of the seizure, but rather, like the cocaine in Hodari D., was abandoned.
With our holding today, we do not disturb our observation in Wilson that “physical movement alone does not negate the possibility that a seizure may nevertheless have occurred.” 953 F.2d at 123. Nor do we hold that an effort to conceal evidence or contraband, by itself, constitutes non-submission. Most importantly, we do not suggest that individuals must comply with unfounded and illegal seizures or face arrest. We simply recognize that, under controlling Supreme Court precedent, when an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment’s exclusionary rule does not apply.
V.
For the reasons stated above, we find no error in the admission of the firearm. We therefore affirm the judgment of the district court.

AFFIRMED

. At the suppression hearing, defense counsel introduced a report of police radio traffic indicating that Officer Yambot reported a suspicious vehicle on his radio only nine seconds before he reported that he had two people in custody. The defense argued that this report showed that "this whole event occurred within nine seconds,” which was too short a time for Officer Halsey’s version of events to play out. However, at trial, Officer Yambot testified that he did not make the first radio call until after the officers had secured both Sto-ver and the passenger. On appeal, Stover does not challenge that testimony.

. Hence, our friend in dissent errs in repeatedly stating that Brendlin and Hodari D. set forth different "tests.” Moreover, the dissent’s even more repeated suggestion that we demand too much in looking to a "signal” of "submission” from Stover seems very odd given the Supreme Court’s use of these very terms in assessing submission in Brendlin. See Brendlin, 551 U.S. at 262, 127 S.Ct. 2400 (explaining that Brendlin, who had "no effective way to signal submission while the car was still moving ... once it came to a stop [ ] could, and apparently did, submit by staying inside”) (emphasis added). Although the dissent places great emphasis on the fact that Stover’s car was not moving when the police arrived, Stover certainly was not "deprived of the ability to signal submission,” as the dissent. contends. Rather, Stover could easily have signaled submission in the very way Brendlin did — or, as discussed below, any number of other ways.

. Our dissenting colleague maintains that "the relevant show of authority made by police consisted solely of turning on the police vehicle's overhead lights and blocking in Mr. Stover's truck.” He can do so only by making new findings of fact. In his effort to place the moment of seizure earlier, the dissent disaggregates what the district court found to be a continuous series of events that happened rapidly prior to Stover’s submission. In accord with the testimony at the suppression hearing, the court found that in quick succession the officers not only blocked Sto-ver's car, activated their emergency lights, and turned a spotlight on Stover, but also immediately ordered Stover to remain in his car and when Stover disobeyed, ordered him to return to the car. The court further found that Stover again disobeyed police orders, walked away from his car and the officers with a loaded gun in his hand, which he discarded in brush in front of the car, and then and only then when confronted by an armed officer did Stover submit to police authority. The dissent invokes Mendenhall to argue that we can consider only the officers’ initial actions, but Mendenhall instructs us to "view [ ] all of the circumstances surrounding the incident.” 446 U.S. at 554, 100 S.Ct. 1870. Thus, all of the officers' conduct prior to Stover’s submission constitutes the “relevant show of authority.”

. In contending that "no reasonable assessment of the facts can support the conclusion that Stover attempted to leave,” the dissent refuses to consider the facts in the light most favorable to the Government — as we must. On one hand, Stover never testified as to his intent or anything else. On the other hand, Officer Halsey testified at the suppression hearing that he believed Stover might have fled the scene had the officer not confronted him at the hood of the car. Defense counsel specifically asked Officer Halsey: "[D]id you do anything to make [Stover] stop or did he stop on his own?” Officer Halsey responded, "Yes, I did.... I ran up in front of him with the gun in his face.” Thus the undisputed record evidence is that Stover walked away from the officers with no indication that he would stop of his own volition; indeed, he gave the officers no information whatsoever about what he was doing. The dissent's generous inference clarifying Stover's intentions views the record, at the very least, in the light most favorable to Stover.

. In its appellate brief in Jones, the Government cited Hodari D. just once and then for the single proposition that an encounter is consensual only if a reasonable person would feel free “to disregard the police and go about his business.” Brief of the United States at 12, Jones, 678 F.3d 293 (No. 11-4268) (internal quotation marks omitted). Hence, Stover's heavy reliance on Jones is misplaced.

. Attempting to find some support for its preferred holding, the dissent ignores the "extreme[] cooperation] with,” and thus submission to, police authority by the defendant in Black. That cooperation stands in striking contrast to Stover’s repeated active disobedience of police orders from the outset of the encounter.

. Nor does the dissent cite such a case. Instead, it relies on two inapposite cases — United States v. Lowe, 791 F.3d 424, 433 (3d Cir.2015); Kansas v. Smith, 286 Kan. 402, 184 P.3d 890, 896 (2008) — for the proposition that “[t]o passively acquiesce, Stover merely had to remain at the focal point of the police investigation rather than attempting to flee, evade the seizure, or jeopardize the safety of police.” We need not determine whether the conduct described by the dissent constitutes passive acquiescence, because Stover’s conduct — ignoring police orders and walking away with a loaded gun — hardly establishes that he did not attempt flight, seek to evade or place police safety in jeopardy. Indeed, the Lowe court found that the defendant submitted in part because he did not ’’reach[] for a weapon” or ”turn[] around in an attempt to walk.” 791 F.3d at 433-34.